IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID LANG** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-4042** |
| | : | |
| **SPRINGFIELD SCHOOL DISTRICT** | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                                           **April 25, 2024**

      This case is about a high school teacher who received a serious medical diagnosis just when his school district was making personnel and curriculum changes.  After he told the school district about his condition and took medical leave, the district informed him that he had been reassigned to teach STEM classes at the middle school.  Unlike his high-school graphic arts studio, the middle-school was hot, dusty, and lacked central air conditioning — a major problem for his illness.  Relying on the Americans with Disabilities Act, the teacher asked to remain at the high school.

      After much correspondence, the school district refused to permit the teacher to stay at the high school, citing staffing and other logistical needs.  Instead, it offered to install air conditioning in the middle school STEM classroom and make other accommodations.  The teacher was unsatisfied; he took an early retirement and sued the school district.  We now face cross motions for summary judgment.  But there are genuine disputes of material fact.  The teacher's case will continue to trial on his claim that the school district failed to offer him reasonable accommodations.  But there can be no dispute that the school district engaged in the interactive process in good faith.  Nor can the teacher show that the school district discriminated

against him on the basis of his medical condition, or that it retaliated against him for protected conduct.  So those claims are dismissed.

I.      **Factual Background**[1]

Defendant Springfield School District (the "District") is a public school district located in Delaware County, Pennsylvania, consisting of three elementary schools, one middle school, and one high school.  DI 14 ¶ 3; DI 17-1 ¶ 3.  Plaintiff Mr. David Lang was an industrial arts teacher at the District from 1999 until October of 2021 with teaching certifications in "industrial arts/technology," "business computer information technology," and art.  DI 14 ¶ 4; DI 17-1 ¶ 4.

During the 2020-2021 school year, Mr. Lang taught graphic arts and design classes at the District's high school.  DI 14 ¶ 7; DI 17-1 ¶ 7.  During that same school year, the District made course, curriculum, and personnel changes for the following school year.[2]  As part of these changes, the District promoted Mrs. Monica Conlin ("Mrs. Conlin") to principal of the District's middle school.  DI 14 ¶ 10; DI ¶ 17-1.  But Mrs. Conlin's husband, Mr. Jim Conlin, taught at the middle school, so Mrs. Conlin's promotion posed a problem under the District's "Employment Practices for Family Members" policy.  DI 14 ¶ 12; DI 17-1¶ 12.  Under the policy, closely related staff members are not permitted to serve in supervisory capacities over one another.  *Id.*  To avoid a conflict under the policy, the District decided to swap Mr. Lang and Mr. Conlin's assignments; Mr. Lang would teach at the middle school and Mr. Conlin would teach at the high

---

[1] We draw these facts from (1) the District's statement of material facts admitted or undisputed in Mr. Lang's opposition, (2) Mr. Lang's response to the District's statement of facts (DI 17-1 at 1-12 (ECF)) and his supplemental statement of facts (DI 17-1 at 12-21 (ECF), hereinafter "Lang Supp. F."), and (3) the exhibits and record items filed with the parties' briefs.

[2] DI 14 ¶¶ 8-10; DI 17-1 ¶¶ 8-10.  The parties dispute when exactly during the school year these changes were made, but their dispute is not material to our decision.

school.³ Mr. Lang's new courses at the middle school would include, among other things, the use of power equipment to cut materials. DI 14-18 at 3 (ECF).

But in March of 2021, before the District could inform Mr. Lang of his reassignment to the middle school for the next school year, he was diagnosed with papillary thyroid cancer. DI 14 ¶ 16; DI 17-1 ¶ 16. On April 7, 2021, he informed the District that he had cancer and needed to take leave effective the next day. DI 14 ¶ 17; DI 17-1 ¶ 17. After a surgery in April of 2021, the District and Mr. Lang decided that he would remain on leave through the rest of the school year. DI 14 ¶¶ 19-20; DI 17-1 ¶¶ 19-20.

On June 14, 2021, the District informed Mr. Lang of his reassignment to the middle school. DI 14 ¶¶ 21-22; DI 17-1 ¶¶ 21-22. On June 18, 2021, Mr. Lang responded that he could not work at the middle school due to temperature and ventilation concerns associated with his condition. DI 14 ¶ 23; DI 17-1 ¶ 23. On June 24, 2021, the District acknowledged Mr. Lang's concerns about the middle school and stated that it would be "happy" to further discuss them,

---

³ DI 14 ¶¶ 12-14; DI 17-1 ¶¶ 12-14. Mr. Lang purports to dispute that the policy required Mr. Conlin's reassignment because the District's superintendent, Dr. Anthony Barber, testified that his "experience," rather than the policy, triggered the reassignment. DI 17-1 ¶¶ 12-13. We do not agree with this characterization of Dr. Barber's testimony. Dr. Barber testified that while he did not recall specifics, and while the decision was "based" on experience, he did not make the decision on his own, and instead relied on expert input about the policy from the District's human resources director, Ms. Linda Bellace. DI 17-4 at 10 (ECF).
  Mr. Lang also argues that Ms. Bellace "admitted" that two assistant principals at the middle school, rather than Mrs. Conlin, could have supervised Mr. Conlin. DI 17-1 ¶ 12. But Ms. Bellace also testified that while there were indeed assistant principals at the middle school who could have "assist[ed] in [] supervising" Mr. Conlin, "the principal ultimately determines the evaluation of the teacher." DI 17-3 at 10 (ECF). And under the policy, "one cannot . . . be evaluated by a spouse." *Id.* Mr. Lang does not offer evidence to dispute this.
  Finally, Mr. Lang argues that the District made prior exceptions to the policy. DI 17-1 ¶ 12. But as Ms. Bellace testified, those limited exceptions did not involve the policy's prohibition on spouses reporting to, supervising, or evaluating each other at the middle school. DI 17-3 at 10 (ECF). The District has never made an exception to the policy in those circumstances. *Id.* It is therefore undisputed that the policy required Mr. Conlin's reassignment.

together with "options for a leave," once Mr. Lang knew his medical status for the next school year.  DI 14 ¶ 24; DI 17-1 ¶ 24.

On July 8, 2021, Mr. Lang, in a letter authored by counsel, requested ADA accommodations for his cancer diagnosis in the form of an air-conditioned environment with limited dust exposure.  DI 14 ¶ 25; DI 17-1 ¶ 25.  Counsel stated that Mr. Lang's most recent position at the high school satisfied these conditions, but the new position at the middle school did not, in part because it involved using power equipment to cut materials.  DI 14-18 at 2-3 (ECF).  Counsel also included a letter dated July 2, 2021 from Mr. Lang's cancer doctor, Dr. Saba Aftab.  *Id.* at 4 (ECF).  Dr. Aftab's letter stated that Mr. Lang could only work in a building that was "centrally air conditioned for thermal comfort with good air quality through proper ventilation with filtration in a dust free environment," and that a transfer to a new position without such conditions would compromise his health and prevent him from performing the essential elements of his job.  DI 14 ¶ 25; DI 17-1 ¶ 25; DI 14-18 at 4 (ECF).

On July 21, 2021, the District informed Mr. Lang that he could not remain at the high school because there were no vacant positions there following curriculum changes and other teacher reassignments.  DI 14 ¶ 27; DI 17-1 ¶ 27.  The District noted that to keep Mr. Lang at the high school, it would need to displace other employees or create new positions.  DI 14-19 at 2 (ECF).  The District instead offered alternate accommodations at the middle school including the installation of air conditioning equipment in Mr. Lang's classroom, portable dust collection equipment, personal protective equipment such as a dust mask or face shield, and a microphone[4] to alleviate stress on Mr. Lang's vocal cords.  DI 14, ¶¶ 27-28; DI 17-1 ¶¶ 27-28; DI 14-19 at 2-3

---

[4] Dr. Aftab did not address vocal cord stress; the District volunteered the microphone.  DI 14-19 at 3 (ECF).

(ECF). The District invited additional suggestions by Mr. Lang's provider and continued engagement in the interactive process. DI 14, ¶¶ 27-28; DI 17-1 ¶¶ 27-28.

On August 4, 2021, Mr. Lang's counsel again requested that he remain at the high school, and again the District rejected his request. DI 14 ¶¶ 30-32; DI 17-1 ¶¶ 30-32. On August 10, 2021, Mr. Lang's counsel forwarded a second letter by Dr. Aftab rejecting the District's proposed accommodations as inadequate, stating that Mr. Lang needed accommodations that "address[ed] the environmental temperature in the building (not just his classroom)" and met "the need for building wide air filtration, limited dust, and [a] mold free environment." DI 14 ¶ 36; DI 17-1 ¶ 36; DI 14-24 at 3 (ECF). Dr. Aftab's letter also indicated that the new middle school position would require Mr. Lang to cut materials regularly (creating dust), as opposed to his previous position, which involved digital design only. *Id.* On August 20, 2021, the District responded by offering to "explore"[5] the use of pre-cut pieces at the middle school to avoid dust generation. DI 14 ¶¶ 39-40; DI 17-1 ¶¶ 39-40.

Meanwhile, as the new school year began, Mr. Lang did not return to work at either the high school or middle school, and his counsel continued to engage with the District about his medical absence and the possibility of long-term disability or sabbatical leave. DI 14 ¶¶ 33-34, 38, 42- 46; DI 17-1 ¶¶ 33-34, 38, 42- 46. Dr. Aftab submitted several more letters to the District about Mr. Lang's condition and absence, ultimately clearing him to return to work on October 14, 2021 (but only at the high school). DI 14 ¶¶ 44, 46, 49; DI 17-1 ¶¶ 44, 46, 49. Given the

---

[5] The District officially offered the use of pre-cut pieces in Mr. Lang's classes as an additional accommodation on October 11, 2021. DI 14 ¶ 45; DI 17-1 ¶ 45.

District's continued refusal to place him at the high school, Mr. Lang opted to retire from the District.[6]

Mr. Lang filed administrative charges, exhausted his administrative remedies, and sued the District for violations under the ADA and Pennsylvania Human Relations Act ("PHRA"). DI 1 at 6, 7 (ECF). Under the ADA, Mr. Lang alleges a failure to accommodate claim and disparate treatment and retaliation claims. *Id.* ¶ 34. Under the PHRA, Mr. Lang alleges a failure to accommodate claim. *Id.* ¶¶ 39-40.[7]

## II.   Cross-Motions for Summary Judgment

The District timely moved for summary judgment on Mr. Lang's ADA failure to accommodate claim, arguing that the facts undisputedly show that it offered him reasonable accommodations and engaged in the interactive process in good faith, and that Mr. Lang's requested accommodation was not reasonable. DI 14-1 at 4, 10, 11 (ECF). The District also moved for summary judgment on Mr. Lang's ADA disparate treatment and retaliation claims, arguing that the facts undisputedly establish that it reassigned Mr. Lang before learning of his medical condition, and therefore did not transfer him based on his medical condition or in retaliation for protected conduct. *Id.* at 13 (ECF).

Mr. Lang responded to the District's motion in an opposition brief dually styled as a cross-motion for summary judgment as to liability.[8] DI 17, 18. Mr. Lang argues in opposition to

---

[6] DI 14 ¶¶ 45, 48; DI 17-1 ¶¶ 45, 48; Lang Supp. F. ¶ 19. The parties dispute the exact date in October of 2021 on which Mr. Lang officially retired, but their dispute is not material to our decision. *See* DI 14 ¶ 48; Lang Supp. F. ¶ 19.

[7] Neither party addresses Mr. Lang's PHRA failure to accommodate claim in their summary judgment papers, so we make no decision regarding that claim here.

[8] The cross-motion was untimely and impermissible. Mr. Lang filed his summary judgment motion nearly one month after the summary judgment deadline in this case, which had

6

the District's motion that he could have easily remained at the high school with no undue burden to the District and the District acted in bad faith.  DI 17 at 20, 22, 34 (ECF).

### III. **Standard of Review**

The Federal Rules of Civil Procedure require summary judgment movants to "show[] that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022) ("[F]or a factual dispute to be material, its resolution must have the potential to affect the outcome of the suit.").  And a "genuine dispute" over a material fact means "a reasonable jury could return a verdict for" the party not moving for summary judgment.  *Anderson*, 477 U.S. at 248.  In deciding whether a genuine dispute of material fact exists, we must view "the evidence in the light most favorable to the nonmovant."  *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *see Young v. Martin*, 801 F.3d 172, 174 n.2 (3d Cir. 2015).  We may not "weigh the evidence [or] assess its veracity."  *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021).

---

been extended by agreement of the parties.  *See* DI 12; DI 13; DI 18.  Though we granted Mr. Lang an extension to oppose the District's summary judgment motion due to counsel's schedule, we did not grant, nor did Mr. Lang request, an extension of the summary judgment motion deadline.  *See* DI 15; DI 16.  We could have granted such a motion for good cause before the deadline, or for excusable neglect after the deadline.  *See* Fed. R. Civ. P. 6(b)(1)(B).  Mr. Lang has not explained why his motion was untimely, which requires that we deny it, because we "must" make a finding of excusable neglect before permitting an untimely summary judgment motion.  *Drippe v. Tobelinski*, 604 F.3d 778, 785 (3d Cir. 2010); *McCoy v. C-Work Sols., LP*, 2022 WL 1265528, at *3 (E.D. Pa. Apr. 28, 2022).  However, even if we considered Mr. Lang's motion for summary judgment, we would deny it on its merits for the reasons stated *infra*.  Such untimeliness of his motion does not, however, preclude reliance on the material facts advanced in Mr. Lang's opposition brief, the majority of which remain undisputed by the District.  *See* Lang Supp. F.; DI 19.

IV.  **Analysis**

    a. <u>There are genuine disputes of material fact regarding whether the District violated the ADA by failing to offer reasonable accommodations to Mr. Lang.</u>

Under the ADA, employers have a duty to make reasonable accommodations for disabled employees. *Lewis v. Univ. of Pa.*, 779 F. App'x 920, 923 (3d Cir. 2019) (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504-05 (3d Cir. 2010)). An employer breaches this duty by "failing to provide an accommodation that is reasonable or by failing to engage in a good faith interactive process to identify accommodations." *Id.* (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317-18 (3d Cir. 1999)). "Generally, the question of whether a proposed accommodation is reasonable is a question of fact." *Buskirk v. Apollo Metals*, 307 F.3d 160, 170 (3d Cir. 2002). There is a question of fact sufficient to forestall summary judgment on an ADA failure to accommodate claim where a reasonable juror could conclude that the alternative accommodations a defendant offered to a plaintiff were not sufficient to allow the plaintiff to perform the essential functions of their position despite their condition. *Phillips v. Ctr. for Vision Loss*, 2017 WL 839465, at *13 (M.D. Pa. Mar. 3, 2017); *Solomon v. Sch. Dist. of Phila.*, 882 F. Supp. 2d 766, 780 (E.D. Pa. 2012). Here, competing evidence creates genuine disputes of fact regarding whether the District's proposed accommodations were sufficient to meet Mr. Lang's medical needs. *See ADA Anglemeyer v. Ammons*, 92 F.4th 184, 190 (3d Cir. 2024) (competing evidence constitutes a "classic factual dispute" appropriate for resolution at trial); *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (same).

The District first argues that "there is no dispute that [it] offered [Mr. Lang] reasonable accommodations" and that it "crafted accommodations that would meet the stated requirements of [Mr. Lang] and his doctor." DI 14-1 at 4, 7 (ECF). The District cites testimony of Dr. Aftab that Mr. Lang could work in an environment without central air conditioning as long as the

rooms in which he worked had air conditioning and any time spent moving between air-conditioned rooms was brief.  DI 14-1 at 8-9 (ECF); DI 14-14 at 34 (ECF).  Similarly, she testified that a cleaned classroom free of excess dust, or in other words, a "normal" amount of dust "would be fine."  DI 14-14 at 34-35 (ECF).

But Dr. Aftab also testified that she understood Mr. Lang's new position at the middle school to require more than momentary excursions into non-airconditioned spaces and described the health hazards this could pose.  *Id.* at 41-42, 54 (ECF).  She further testified that moving from a cold space to a hot space "could be an issue" for Mr. Lang.  *Id.* at 34.  And as Mr. Lang notes, Dr. Jeffrey Zwieback, director of secondary schools for the District, testified that he was aware of approximately ten complaints that the middle school was "too hot."  DI 17-1 ¶ 8.  So hot, in fact, that during warm spells in recent years, he had to order fans for the middle school, "move[] to half days," and "let staff wear shorts."  DI 17-1 ¶ 8; DI 17-11 at 3 (ECF).  And Dr. Barber testified about student complaints of excessive heat at the middle school.  DI 17-1 ¶ 8; DI 14-10 at 3 (ECF).  Though Dr. Aftab testified that it "would be fine" for Mr. Lang to work in a non-centrally air-conditioned building if he were "confined to one classroom that was adequately air conditioned," DI 14-14 at 60 (ECF), the District does not show beyond dispute that such would be the case at the middle school.  To the contrary, from the evidence described above, a reasonable juror could conclude that the temperature at the middle school was too high or too varied for Mr. Lang to work there safely, even if the District installed air conditioning in his classroom(s) as promised.

Similarly, the record is mixed regarding the amount of dust that Mr. Lang could tolerate in his workspace, as well as the amount of dust and ventilation he would encounter at the middle school with accommodations.  Dr. Aftab testified that Mr. Lang could tolerate varying levels of

9

dust, from "normal" amounts of dust to no amount of dust. DI 14-14 at 35, 41-42 (ECF). She testified that a portable dust collector and a face mask could not prevent dust that had already been generated from entering Mr. Lang's lungs, and additionally stated that a face mask could cause temperature regulation issues for Mr. Lang. *Id.* at 42 (ECF). And she testified that even if the elements of Mr. Lang's position involving cutting materials were modified to reduce dust generation, he would still need to work in a "dust free" environment with a "centrally filtrated air system." *Id.* at 40-41, 61-62 (ECF). And as Mr. Lang points out, the District's "own description of the STEM classes at the [m]iddle [s]chool to which [Mr. Lang] was assigned describe[] the significant amount of dust, specifically 'medium/high level[s] of dust' present in those classes." DI 17-1 ¶ 39; DI 17-10 at 2 (ECF). From the record, a reasonable juror could conclude that the middle school was too dusty or otherwise lacked the central ventilation system Mr. Lang needed to work there safely.

The District also argues that Mr. Lang's requested accommodation, remaining at the high school, was not reasonable because it would have caused insurmountable logistical difficulties. DI 14-1 at 10 (ECF). The District argues that under *US Airways, Inc. v. Barnett*, an employee's requested accommodation is not reasonable as a matter of law where it would require an employer to violate a uniformly applied policy. *Id.* (citing 535 U.S. 391 (2002)).

But that is not the rule. First, *US Airways* concerned an employee's requested exception to a "seniority system" of staffing; not just any internal policy. 535 U.S. at 402. Next, the *US Airways* Court stated that to survive summary judgment on an ADA accommodations claim where a defendant rejected a plaintiff's requested accommodation, the plaintiff must first show that his requested accommodation was reasonable on its face, *i.e.*, ordinary "in the run of cases." *Id.* at 401 (cleaned up). The Court ruled that a plaintiff's request to remain in a certain job is not

10

reasonable where it would require their employer to violate a uniformly applied seniority system, unless the plaintiff could show that special circumstances warranted an exception to the system. *Id.* at 405. Further, if the plaintiff's requested accommodation was reasonable, the defendant could nevertheless win summary judgment upon a showing of "undue hardship." *Id.* at 402.

Here, though Mr. Lang's requested accommodation does not concern a seniority system, the *US Airways* framework applies. *Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 361 (3d Cir. 2002). Genuine disputes of material fact permeate even the framework's first step. For example, we cannot decide as a matter of law whether the District could have kept Mr. Lang at the high school by sending Mr. Conlin to a different school or by sending another teacher to the middle school instead of Mr. Lang.[9] *See US Airways*, 535 U.S. at 401-02 (adopting *Reed v. LePage Bakeries*, Inc., 244 F.3d 254, 259 (1st Cir. 2001), and *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995), and stating that a plaintiff meets the initial reasonableness burden by showing that their requested accommodation is plausible or feasible). The "conflicting evidence" about the feasibility of Mr. Lang's requested accommodation must be resolved by a

---

[9] The District argues that by the time Mr. Lang requested accommodations, it had already made staffing assignments for the next year and there were no open positions at the high school for Mr. Lang, so his requested accommodation was not possible. DI 14-1 at 10 (ECF). Mr. Lang argues in response that the District had more than two months during the summer to make staffing changes that would permit him to stay at the high school the following year. Lang. Supp. F. ¶ 11. Mr. Lang specifically argues that Mr. Conlin could have moved to an elementary school instead of the high school, or that a teacher at the high school, Ms. Jamie Sheehan, could have taken over Mr. Conlin's courses at the middle school instead of Mr. Lang. DI 17-1 ¶ 9; Lang. Supp. F. ¶¶ 11-12. The District responds that there were no suitable vacancies for Mr. Conlin at the elementary schools and Mr. Lang was not well suited to teach Ms. Sheehan's courses at the high school. DI 19 at 3-4 (ECF). Though the District argues that Mr. Lang was the "best" teacher to fill Mr. Conlin's vacancy at the middle school, DI 19 at 4 (ECF), on this record a reasonable juror could find that it would nevertheless be *plausible* or *feasible* for the District to arrange its staff in some fashion such that Mr. Lang could remain at the high school.

11

jury. *Ames v. Wash. Health Sys. Foot & Ankle Specialists*, 2021 WL 4594673, at *4 (W.D. Pa. Oct. 6, 2021).

For these reasons, the District's motion for summary judgment is denied as to the failure to offer reasonable accommodations claim.

      b. <u>Mr. Lang lacks evidence sufficient to show that the District failed to engage in good faith.</u>

An employer can also breach their duty to accommodate under the ADA by "failing to engage in a good faith interactive process to identify accommodations." *Lewis*, 779 F. App'x at 923 (citing *Taylor*, 184 F.3d at 317-18). To state a claim for failure to participate in the interactive process a plaintiff must allege: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d 296, 319 (3d Cir. 1999); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 772 (3d Cir. 2004) (same). "[W]here there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded." *Lewis*, 779 F. App'x. at 923. Employers can demonstrate good faith "in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor*, 184 F.3d at 317. For example, an employer cannot win summary judgment on an interactive process claim where there is evidence that it "issued a flat denial" of a plaintiff's requested accommodations without "making any effort to communicate with [the plaintiff] regarding [their] needs." *Lewis*,

779 F. App'x at 923. But in contrast, where an employer engages in "the good faith steps identified in *Taylor*," a plaintiff's "pure speculation" that the employer's accommodation denial was "predetermined in bad faith" does not establish a factual dispute sufficient to preclude summary judgment, especially where the plaintiff unilaterally ended the interactive process. *Doyle v. Senneca Holdings, Inc.*, 2022 WL 1239501, at *8 (W.D. Pa. Apr. 27, 2022). Further, "[t]he interactive process does not dictate that any particular concession must be made by the employer," *Taylor*, 184 F.3d at 317, and in fact, all it requires "is that employers make a good-faith effort to seek accommodations." *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169, 187 (3d Cir. 2009) (quoting *Taylor*, 184 F.3d at 317).

The District argues that, as directed by *Taylor*, it engaged in the interactive process in good faith by frequently corresponding with Mr. Lang and his counsel, carefully considering Mr. Lang's stated medical needs, and offering multiple accommodations in response. DI 14-1 at 12-13 (ECF). We agree. Over the course of nearly six months, the District corresponded regularly with Mr. Lang and his counsel about his condition, his absence from school, and his need to be accommodated. DI 14 ¶¶ 17, 20-25, 27-28, 30-36, 38-40, 43-46; DI 17-1 ¶¶ 17, 20-25, 27-28, 30-36, 38-40, 43-46. Though the District rejected Mr. Lang's requested accommodation, it volunteered several alternatives, including an accommodation for a symptom that Mr. Lang and his doctor did not cite in their requests: vocal strain. DI 14-19 at 2-3 (ECF). It invited further input from Mr. Lang's medical provider and communicated an intent to continue engaging in the interactive process. *Id.*; DI 14-21 at 2-3 (ECF). In response to Mr. Lang's concerns about dust, it explored and then offered an additional accommodation in the form of pre-cut materials. DI 14-26 at 2 (ECF); DI 14-29 at 2 (ECF). It is clear from the record that the District "request[ed] information about [Mr. Lang's] condition and what limitations [he] had," discussed the

13

accommodation he specifically requested, "show[ed] some sign of having considered [his] request, and offer[ed] and discuss[ed] available alternatives." *Taylor*, 184 F.3d at 317. That is all the interactive process requires. *Hohider*, 574 F.3d at 187.

Mr. Lang's arguments that the District acted in bad faith are largely speculative and unsupported by the record. *Doyle*, 2022 WL 1239501, at *8. For example, he argues that the District merely went "through the motions" of the interactive process and ignored Dr. Aftab's offers to further explain his condition. DI 17 at 21 (ECF). Mr. Lang does not support these charges with any evidence, as he must on summary judgment. *Gregor v. Johnsen*, 2017 WL 11368374, at *3 (M.D. Pa. Aug. 5, 2019) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). Nor could he, as the undisputed record establishes the opposite. *See supra*. Mr. Lang also argues that the District's refusal to grant his requested accommodation itself demonstrates bad faith.[10] But an employer's good faith engagement in the interactive process does not guarantee an employee any particular accommodation. *Taylor*, 184 F.3d at 317. Similarly, Mr. Lang argues that the District showed bad faith because Dr. Barber, superintendent, did not personally review Dr. Aftab's letters. DI 17 at 21 (ECF). This does not disturb the District's showing that appropriate staff at the District reviewed and responded to Mr. Lang's accommodations request. For example, Mr. Lang makes no argument, nor could he, that the

---

[10] DI 17 at 21 (ECF). As part of this argument, Mr. Lang claims that Dr. Barber and Ms. Bellace testified that his requested accommodation was reasonable. *Id.* Not so. Dr. Barber testified that while he never personally concluded that Mr. Lang's requested accommodation was unreasonable, the "team," including him, did. DI 19-2 at 3-7 (ECF). And Ms. Bellace testified that Mr. Lang's request to remain at the high school was "not unreasonable" in the sense that she understood why it would be his preference. DI 14-12 at 14 (ECF). She did not testify that it was a reasonable accommodation owed to him under the ADA. And even if Dr. Barber and Ms. Bellace had testified that remaining at the high school was a reasonable accommodation, the interactive process analysis concerns the District's conduct during the interactive process, not the reasonableness of accommodations discussed during that process.

District made a "flat denial" of his request without reviewing and considering Dr. Aftab's letters or Mr. Lang's other correspondences. *Lewis*, 779 F. App'x at 923. Even on Mr. Lang's record, there can be no dispute that the District engaged in the interactive process in good faith. As such, we grant the District's motion for summary judgment as to Mr. Lang's interactive process claim.

        c. <u>Mr. Lang cannot show that the District's reason for his transfer was pretext for discrimination.</u>

Employers violate the ADA when they take adverse action against a disabled employee based on the employee's disability; these are called "disparate treatment" claims. *Hollingsworth v. R. Home Prop. Mgmt., LLC*, 498 F. Supp. 3d 590, 601 (E.D. Pa. 2020) (citing *Taylor*, 184 F.3d at 306; *Isley v. Aker Phila. Shipyard*, 275 F. Supp. 3d 620, 626 (E.D. Pa. 2017)). Similarly, employers violate the ADA by taking adverse action against an employee based on the employee's protected conduct; these are called "retaliation claims." *Shaner v. Synthes (USA)*, 204 F.3d 494, 500 (3d Cir. 2000). Mr. Lang alleges both. DI 1 ¶ 34.

ADA disparate treatment and retaliation claims follow the familiar *McDonnell Douglas* burden shifting framework. *Shaner*, 204 F.3d at 500-01 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this tripartite framework, if a plaintiff succeeds in establishing a prima facie disparate treatment or retaliation claim under the ADA,[11] the burden of

---

[11] To establish a price facie disparate treatment claim, a plaintiff must show that "(1) [they are] a disabled person within the meaning of the ADA; (2) [they are] otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [they have] suffered an otherwise adverse employment decision as a result of discrimination." *Shaner*, 204 F.3d at 500. To establish a prima facie retaliation claim, they must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.*

15

production then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse action. *Id.* (citing *Jones v. Sch. Dist.*, 198 F.3d 403, 410 (3d Cir. 1999)). If the defendant succeeds, the plaintiff must show that the articulated reason was pretext for a discriminatory motive. *Id.* Though the burden of production shifts to the defendant during the second step, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* "Most cases" turn on a plaintiff's ability to establish pretext. *Id.* To establish pretext on summary judgment, a plaintiff must point "to some evidence direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Jones*, 198 F.3d at 413 (cleaned up).

Assuming Mr. Lang could make out his prima facie case, the District articulates a legitimate nondiscriminatory reason for transferring Mr. Lang to the middle school: staffing concerns precipitated by district-wide curriculum and personnel changes, including Mrs. Conlin's promotion to principal at the school where her husband was a teacher. DI 14-1 at 14-15 (ECF). The District further argues that Mr. Lang cannot establish pretext. *Id.* Mr. Lang makes no serious counterargument. First, his opposition does not address his discrimination or retaliation claims, nor does it respond to the District's attack on them. Second, while he makes stray allegations throughout his opposition that the "reason given by [the District]" for his transfer was "false and irrelevant," DI 17 at 6, 11, 22 (ECF); DI 17-1 ¶ 15, those claims are devoid of factual support.[12] Unable to offer "direct evidence" of discrimination or to otherwise

---

[12] Mr. Lang argues that the District did not need to remove Mr. Conlin from the middle school, and that the District's assertion to the contrary "is a flat out falsehood designed to cover up" an ADA violation. DI 17 at 11, 22 (ECF); DI 17-1 ¶ 13. This argument is unavailing for the

"demonstrate [] weaknesses, implausibilities, incoherencies, or contradictions" in the District's proffered reason for his transfer, Mr. Lang cannot forestall summary judgment on his disparate treatment and retaliation claims. *Shaner*, 204 F.3d at 501-03. Therefore, they are dismissed.

## V.     Conclusion

For the reasons discussed above, the District's motion for summary judgment is granted in part and denied in part. Mr. Lang's ADA failure to accommodate claim will proceed to trial on the reasonableness of the dueling accommodations proposed by the parties, but not on the theory that the District failed to engage in the interactive process with good faith. Similarly, his ADA disparate treatment and retaliation claims are dismissed with prejudice. And Mr. Lang's untimely motion for summary judgment is denied.

---

reasons already discussed and does not establish pretext. *See supra*, n.3. Next, Mr. Lang cites an April 7, 2021 meeting between Ms. Bellace and Mr. Lang during which Mr. Lang told Ms. Bellace of his cancer diagnosis, noting that during the meeting, Ms. Bellace still "did not tell him of the [m]iddle [s]chool assignment." DI 17-1 ¶ 15. Mr. Lang appears to be implying that the District did not decide to transfer him to the middle school until after this meeting. But even drawn in favor of Mr. Lang, the facts clearly establish the opposite. Internal documentation shows that the District decided to transfer Mr. Lang at least as early as March 26, 2021, nearly two weeks before it learned that Mr. Lang had cancer and needed to take medical leave. DI 14 ¶ 15; DI 14-11 at 2 (ECF); DI 14-10 at 8 (ECF). Mr. Lang does not dispute this fact. DI 17-1 ¶ 15. And he does not dispute that District staff could not notify him of the transfer earlier because he was absent from school. DI 14 ¶ 15; DI 17-1 ¶ 15.

Mr. Lang also argues that the District should have made alternative staffing arrangements to allow him to stay at the high school. DI 17 at 23-24 (ECF). But this argument goes to Mr. Lang's accommodation claim and cannot establish pretext. *Id.* As Mr. Lang admits, "[a]s a result of Mr. Conlin's reassignment to the [h]igh [s]chool, it was decided that [Mr. Lang] was the best teacher to teach the STEM classes at [the middle school]." DI 14 ¶ 14; DI 17-1 ¶ 14.